## A. G. HARRIS v. SCHUYLKILL ETC. R. CO.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS NO. 2 OF PHILADELPHIA COUNTY.

Argued January 29, 1891—Decided April 6, 1891.

(a) In the construction of its railroad across an unimproved city lot abutting upon a navigable river, the company, as an engineering necessity, erected a bulkhead at the port-wardens' line, outside its appropriation, under an agreement with the landowner that it should be built without cost or expense to him, in labor or material:

1. In the assessment of damages to the land from the location and construction of the railroad, the true test was the difference between the value of the entire lot, as it was immediately before the taking, and the value of what was left of it, after the taking of the part occupied by the company's appropriation.

### Statement of Facts.

2. In estimating the value of the lot before the taking, its possible and probable uses were important elements, and might be shown by the opinions of expert witnesses; but the details and cost of improvements, and probable rental afterwards, were inadmissible as independent facts, though such details, as the basis of opinions as to value, were legitimate subjects of cross-examination.*

3. Though the availability of the lot for improvements was an element of value, the value of the lot at the time of the taking was the value as it then was, not as it might have been with the improvements; and the value of the rest of the lot after the taking was also its value as it then was, and not as it was when subsequently improved and in use as a wharf property.

4. And both values, before and after the taking, were the general market values of the particular lot, considering such advantages and disadvantages only as were special and peculiar to it, and without reference to the general rise or fall common to it and other neighboring properties, consequent upon the coming in of the railroad.

5. The acquisition by the company of its defined appropriation, of itself gave the company no right to erect the bulkhead outside its right of way; and under the terms of the agreement, conferring the right to build it, the benefits to the property caused by the erection of the bulkhead should not be considered as a charge against the lotowner.

6. The presence and effect of a sewer outlet on the lot, before the taking, and whether its subsequent removal was due to the construction of the railroad, were questions of fact for the jury; and the record of a recovery of the ground occupied by the sewer, in ejectment by the lotowner against the city, before the taking, was relevant upon the issues of fact thus raised.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 47 January Term 1891, Sup. Ct.; court below, No. 773 December Term 1885, C. P. No. 2.

On March 14, 1889, the record, with remittitur from the Supreme Court, reversing the order of the court below making absolute a rule to withdraw an appeal from the assessment of damages in favor of Amanda G. Harris against the Schuylkill River East Side Railroad Company, was returned and filed: See Schuylkill etc. R. Co. v. Harris, 124 Pa. 215.

At the second trial of the issue, on March 31, 1890, it was made to appear that on March 31, 1881, the lot of ground in controversy, lying in the Twenty-sixth ward, Philadelphia, and

---

* Cf. Chambers v. South Chester Bor., 140 Pa. 510.

Statement of Facts.

abutting upon the Schuylkill river, was conveyed to Henry G.
Harris; that at that time the lot was low land and covered by
the tidewater, and a city sewer opened upon it; that on April
2, 1881, the councils passed an ordinance for the extension of
the sewer on the line of Ellsworth street, on condition that
Harris would dedicate one half the land required for the exten-
sion of the street; that on October 22, 1881, a deed for ground
necessary for the street extension was tendered to the city and
accepted; that councils failed thereafter to make the necessary
appropriations for the extension of the street and sewer, and in
June, 1885, Harris brought ejectment against the city for the
land occupied by the sewer in its unchanged condition, and
recovered judgment; that on October 10, 1885, said Harris
conveyed the lot in controversy to Amanda G. Harris, and on
November 2, 1885, the defendant, having given bond as secu-
rity for damages, entered upon the land for the construction of
its railroad; that in the construction of the railroad it became
an engineering requirement, as was alleged, that a bulkhead
should be constructed on the port-wardens' line at low-water
mark, to prevent the encroachment of the tidewater, and it was
necessary that the landowner should make application to the
board of port-wardens for a license; that on October 27, 1885,
Joseph D. Ellis, the right-of-way agent of the defendant com-
pany, presented to the landowner a letter or proposition in
writing, as follows: "In consideration of your signing the
application to the wardens of the port for a license to build a
bulkhead on the inner wharf line, I hereby agree that the said
work shall be done without cost or expense to you, either for
labor or material, and I agree to deliver to you a receipted bill
from the contractor for the same;" that the application for the
license was signed by the agent of the landowner and returned
to the right-of-way agent, with the following letter dated Octo-
ber 31, 1885: "Dear Sir: As your proposition to place a bulk-
head at the new port-wardens' line, instead of on the west line
of your road, seems to be reasonable and proper, although I
cannot yet see that it will be of immediate advantage to me, I
accede to it; with proviso, however, that any supposed benefit
to me shall not at any time be insisted on or alleged in mitiga-
tion of any damages to me, or that my assigns may be entitled
to, by reason of your taking your right of way over my property;

and also provided that unless I shall find a method of utilizing the space from your track to said bulkhead property, you shall maintain said bulkhead in a state of repair satisfactory to the port-wardens and authorities controlling water-ways;" that thereupon, the company proceeded to construct its roadbed and to erect the bulkhead, the latter being placed about forty feet west of the company's appropriation; that the claimant's lot was occupied in the construction of the roadbed and bulkhead, and backing the latter with earth, until about March 1, 1887, and at that time the city reconstructed its sewer on Ellsworth street, and afterward the claimant filled up the lot east and west of the railroad appropriation, and rented the property as a wharf, at first for $500 and then for $600 per annum.

Expert witnesses on the part of the plaintiff claimant, testified that the value of the property before the railroad was constructed was from $10,000 to $13,000; after, $4,000 to $6,000.

William J. Pollock being on the stand, the plaintiff proposed to prove by the witness the exact price defendant paid for bulkheading the property, for the purpose of showing the value of the property, what it cost and what it would cost to put a bulkhead there. Objected to.

By the court: Objection sustained; exception.[1]

The plaintiff having rested, expert witnesses called for the defendant testified that by the location and construction of the defendant's railroad, the property of the plaintiff was made of much greater value than it was before.

Henry M. Boyd testified: " The railroad immediately put a bulkhead there, and filled it in, and I think that the property was worth about $6,000 afterwards. It was changed from a piece of swamp land into a marketable property that could be occupied, used and rented for any commercial purpose."

Plaintiff's counsel: Assuming that, immediately before the railroad came there, the property had been bulkheaded, what would it have been worth?

Objected to.

By the court: Objection sustained; exception.[2]

David Evans testified that before the railroad was located and constructed, the property was very undesirable, by reason of the tide-water upon it twice every twenty-four hours, with the additional detriment of the sewer outlet existing, and that

Statement of Facts.

there were no facilities whatever for the use of the property as a wharf property.

Defendant's counsel: Q. Having those things in your mind, and knowing the values of real estate in that location, please state to the jury what you believe the value of that piece of property to have been before the coming of the railroad? Objected to by plaintiff.

By the court: Objection overruled; exception.[3]

Frederick Sylvester, called, testified that before the coming of the railroad, the property had no visible use; it would have been difficult of sale at from $6,000 to $8,000; by the construction of the railroad it was appreciated "as a whole thing;" that, "subsequent to the construction of the road and the improvements made incident to that construction, the property would sell for $10,000, and probably $11,000."

Defendant's counsel: Q. Have you any knowledge of the rental value of that property immediately after the road was constructed? Objected to by plaintiff.

By the court: Objection overruled; exception.[4]

A. I should suppose, in comparison with what I have rented, that that property would rent for $700 or $800.

Cross-examination: Q. You have said that this property after the railroad came there, constructed as it is, with the incidents of that construction, was worth from $10,000 to $11,000? Does that include in your mind the value of it as a wharf property bulkheaded in? A. Yes, sir. Q. Then you mean, if I understand you rightly, when you say the property after the railroad came there was worth from $10,000 to $11,000, that it was a property bulkheaded to that line, and filled in for wharf purposes as it is now? A. I have no reference to the filling in. I have reference to the fact that you could get to the river front, which previously you could not do. Q. What do you mean by that? A. You can use it for wharf purposes. Q. And the bulkheading made it so? A. What was done, I don't know whether it was bulkheaded, made it so. Q. Whatever was done there changed it from being a wharf site into a wharf? A. There was something to tie to there. Q. But that was the effect of it, was it not, to change it from where a wharf might be built to where a wharf actually was built? A. To change it from a possible wharf into a wharf.

Statement of Facts.

Q. Be kind enough to direct your attention to the consideration of it, in the event of that bulkhead having been constructed on the west right-of-way line, and the railroad built entirely upon it within the right-of-way line, leaving the property west of the west right-of-way line and the property east of the east right-of-way line in its natural condition; what then would have been the effect of the railroad upon it,—would it have been to appreciate or depreciate its value? Objected to as a condition of affairs that did not exist.

By the court: Objection sustained; exception.[6]

Q. Be kind enough to direct your mind to the consideration of this property immediately after it had been taken for the purposes of constructing a railroad; assuming that a railroad was to be constructed upon it within the right-of-way lines, leaving the ground on either side of the right-of-way lines in its natural condition; what would have been the effect of the railroad upon this property then? Objected to for the same reason.

By the court: Objection sustained; exception.[7]

Q. The bond in this case was delivered on November 2, 1885, and that was prior to any construction of any kind being placed upon this property. Bearing those facts in mind, be kind enough to state what was the value of this property on November 2, 1885, as affected by the proposed construction of a railroad upon it within the right-of-way lines, as shown upon the map. Objected to.

By the court: Objection sustained; exception.[7]

The same witness testifying on cross-examination that in his opinion it would have been impossible to build a railroad within the right-of-way lines at that point, he was asked:

Plaintiff's counsel: Q. Assuming that your knowledge on that point is not so great as it is upon real-estate matters, confine yourself to considering this case with the railroad built within the right-of-way lines, and the ground left in its natural condition outside of it. Objected to.

By the court: Objection sustained; exception.[8]

Q. Will you tell me what the value of wharf property is on the Schuylkill, south of Christian street; I mean, built-up wharf property, without any railroad upon it, and before the railroad came there? Objected to.

By the court: Objection sustained; exception.[10]

Other like offers by plaintiff, on the cross-examination of defendant's witnesses, were objected to, excluded, and bills sealed.

In her rebuttal case, the plaintiff offered in evidence the record of the ejectment, Harris v. Philadelphia City, No. 781 June Term 1885, C. P. No. 1.   Objected to.

By the court: Objection sustained; exception.[15]

At the close of the testimony, the court, PENNYPACKER, J., charged the jury in part as follows:

You can readily see that the construction of a railroad is a matter involving very considerable work, and oftentimes very considerable time.   [It cannot be done instantly; and, while the right to sue exists at the time of the location, it includes the subsequent construction.] [16]   The measure of damages is the difference between the market value of the whole tract, as it was immediately before the location and construction of the road and unaffected by the road, and the market value after the construction and completion, as affected by the taking and occupation of the road. . . . .

In administering the rule which I have given to you in this case, considerable difficulty arises, because of the peculiar condition, if I may so term it, of this particular lot, and the serious questions of the case will arise just here.   As you have learned, the railroad company, at or about the time of this construction, put up a bulkhead along the port-wardens' line, and from that bulkhead extending eastward the ground has been filled in to a considerable extent.   Much of that work, or most of it, it may be, was done by the railroad company, and some of the filling in was done by Mr. Harris.   [If the erection of that bulkhead was a necessary part of the construction of the road and involved in it, and benefit resulted to the plaintiff here because of the erection of the bulkhead, then that is a fact which in ascertaining the value of the damages you will take into consideration, unless it was provided by the agreement between the parties to the contrary.   If the bulkhead was erected by the railroad company, at a different time, either before or afterwards, and it was not necessary, in the sense that good engineering did not require it, to the construction of the railroad, then you will leave it out of consideration.] [17]

A somewhat similar question arises with reference to the

sewer.   As you have heard, before the coming of the railroad
there was a sewer extending some distance into this lot, about
midway, I think the witnesses have described it, carrying its
filth across the whole ground of the lot into the river.   [At
the time of the construction of the railroad this sewer was re-
moved.   You are to consider this question with reference to
the actual condition of things as they existed at the time, and
without reference to the rights of outside parties including the
city, which cannot be determined in this case.   If that sewer
was removed by the railroad as a necessary part of the construc-
tion of the road, and its removal resulted in benefit to the
plaintiff, then that is a fact, also, which you will consider in
reaching your conclusion.] [18]   If, on the contrary, the sewer
was removed by the city, or what is substantially the same
question, if it was removed by the railroad company under con-
tract with the city, or as the agent of the city for the purpose,
and its removal was only coincident with the construction of
the railroad, then you will leave the question of the sewer out
of your consideration.

There is evidence here as to an arrangement, or compact, or
contract, made between Henry G. Harris and the railroad com-
pany with reference to the bulkhead.   As to what were the
terms of that contract, you have two letters in evidence before
you, and the testimony of the witnesses.   According to the
testimony of Mr. Harris, the contract was as set forth in the
second letter, the letter of October 31, 1885, and that letter,
as the proposal was made to the company by Mr. Harris, was,
" that any supposed benefit to me shall not at any time be
mentioned or alleged in mitigation of any damages to me, or
that my assigns may be entitled to, by reason of your taking
your right of way over my property ; " that with reference to
the bulkhead.   If that was the agreement, then it provides
for the bulkhead in this case, and you will not consider any ad-
vantages arising from the bulkhead in mitigation of damages.
Mr. Ellis, on behalf of the company, testified, however, that
that was not the contract as it was made, and that the con-
tract as agreed to between them was on the basis of the letter
of October 27, 1885, and that that letter was accepted, after he
had refused it as proposed by Mr. Harris.   If that was the
contract, then it does not touch the question in any way.   I so
instruct you.

Charge of Court below.

I have gone over the questions of law which arise in this case. If, with the instruction I have given you, you should find that there was no diminution in value by the taking of the railroad, your verdict would be for the defendant. If there was such diminution in value, measured as I have explained to you, you will give damages for the plaintiff.

The experts of the plaintiff, in their testimony, have estimated the diminution in value from $5,000 to $6,000, and I believe one of them estimated it as high as $7,000. I shall not attempt to go over the evidence with you. It has been presented to you in detail, and it is for your recollection and your determination, and not for mine.

[The experts presented on behalf of the defendant have said, on the contrary, that so far from there being a diminution in value, really the value of this lot has been increased, and they have given you the reasons for it; that it was a water lot, a swamp lot with a sewer on it and filth issuing from it; that before that time it was not used, and that afterwards it had a rental value which they have fixed from $600 to $800. This is the conflicting testimony, and it is entirely and exclusively for your determination.] [19] . . . . .

The plaintiff has asked me to say to you:

1. In estimating the damages to the landowner, caused by the construction of a railroad, the jury must consider the matter just as if they were called on to value the injury at the moment when compensation could first be demanded. As the railroad company gave its bond to secure the payment of damages to the Harris property on November 2, 1885, the rights of the parties in this case must be measured as of that time.

Answer: I decline that point. [20]

2. In estimating the damages to the Harris wharf property, the jury should ascertain what the property unaffected by the construction of the railroad was worth at the time the injury was committed, viz., on November 2, 1885, and what it was worth as affected by the injury, immediately after the entry and taking by the railroad company. The difference in value is the true measure of compensation, and on that sum interest should be allowed and added from November 2, 1885, to the date of the verdict.

Answer: I decline that point. If you should find the ver-

Charge of Court below.

dict for the plaintiff, you would be entitled to give as damages what the interest would be from the time of the entry of the railroad,—the location of the railroad.[21]

5. That any benefit or advantage resulting to Mrs. Harris by the subsequent building of the bulkhead by the railroad company, at the port-wardens' line, must be disregarded by the jury in considering the advantages and disadvantages of the construction of the railroad and the taking of part of her land.

Answer: I decline that point. [22]

6. If the jury find from the evidence that the defendant company constructed the bulkhead on the inner port-wardens' line, and filled in between its railroad tracks and said port-wardens' line for the purpose of constructing and securing its line of tracks across this property, without the request of the owner, no claim for the cost thereof can be made or set off by the defendant company in this action, and no allowance should be made therefor.

Answer: I decline that point.[23]

7. There is no evidence that the owner of the property requested the defendant company to fill in between its railroad tracks and the port-wardens' line, and to erect a bulkhead thereon ; the only evidence is a permission by the owner to the company, to make such construction at no cost to or liability upon her.

Answer: As to what the evidence is upon that point and upon every other point is a question of fact for you.[24]

9. The defendant's authority extends only to the construction and operation of a railroad between the right-of-way lines.

Answer: I decline that point.[25]

11. The presence of a sewer upon the plaintiff's land, wrongfully and unlawfully constructed or maintained there by the city, cannot be set up by the railroad company to depreciate or lessen the value of her land. Nor can the removal of such sewer from the land by the railroad company, for the proper construction of its road, or by an arrangement with the city, be claimed by the company as a benefit to the land and an allowance be made therefor by the jury.

Answer: I decline that point.[26]

—The jury returned a verdict in favor of the plaintiff for

$2,500. A rule for a new trial having been discharged and judgment entered, the plaintiff took this appeal, assigning for error:

1, 2. The refusal of the plaintiff's offers.[1] [2]

3, 4. The admission of the defendant's offers.[3] [4]

6–15. The refusal of the plaintiff's offers.[6 to 15]

16–19. The portions of the charge embraced in [ ] [16 to 19]

20–26. The answers to the plaintiff's points.[20 to 26]

*Mr. Francis E. Brewster* (with him *Mr. M. Hampton Todd*), for the appellant.

As to the qualifications of witnesses, counsel cited: Pittsb. etc. Ry. Co. v. Vance, 115 Pa. 332; Del. etc. Canal Co. v. Barnes, 31 Pa. 193; Huntingdon etc. R. Co. v. Decker, 82 Pa. 124. That the proper inquiry was as to the value of the property for the most advantageous uses: Harvey v. Railroad Co., 47 Pa. 435; Pittsb. etc. R. Co. v. Patterson, 107 Pa. 461; Penna. etc. R. Co. v. Cleary, 125 Pa. 442; Pittsb. etc. Ry. Co. v. Vance, supra; Shenango etc. R. Co. v. Braham, 79 Pa. 453. That the defendant was not entitled to credit for the advantages created by the bulkhead: Irwin v. Trego, 22 Pa. 368; Miles v. Williamson, 24 Pa. 135; Sanderson v. Coal Co., 102 Pa. 375; and the right to damages was fixed by the location and dated from that time: Neal v. Railroad Co., 2 Gr. 137; Wadhams v. Railroad Co., 42 Pa. 303; Beale v. Railroad Co., 86 Pa. 509; Pittsb. etc. Ry. Co. v. Commonwealth, 101 Pa. 196.

*Mr. Thad. L. Vanderslice*, for the appellee.

OPINION, MR. JUSTICE MITCHELL:

It has been said too often and too recently to require repetition that the true test of damages for the taking of land for railroad purposes is the difference between the value of the entire lot as it was just before the taking, and the value of what is left after the taking. Both parties to the present controversy admit this rule, but both sought at the trial to present evidence in violation of it. The appellee unfortunately succeeded.

In estimating the value of the lot before the taking, its possible and probable uses are important elements, and may be

shown by the opinions of experts. But the details of improvements, the cost, probable rent afterwards, etc., require knowledge of the subject, to insure the proper weight to be given, and the inferences to be drawn from them. Hence they are not admissible as independent facts for the jury, and the appellant's offers in that regard, as, e. g., to prove the cost of bulkheading this lot to make a wharf of it, were properly excluded. But such details ought to enter into the view of the expert in forming his judgment, and whether they have done so is a legitimate subject of cross-examination. Again; the value of the lot at the time of the taking is the value as it was, not as it might have been with improvements, though the availability for these is, as already said, an element in its value as it is. And the value of the rest of the lot after the taking is also its value as it then is, not as it is when improved. And both values, before and after the taking, are the general market values of the particular lot, considering such advantages or disadvantages as are special and peculiar to it, without reference to the general rise or fall common to it, with other property in the neighborhood, consequent upon the coming of the railroad. Without going into the details of the numerous assignments of error on this branch of the case, it is sufficient to say that appellant's questions on cross-examination, as to the basis of the opinions of the appellee's experts, should have been admitted, and also that his objections to the opinions of the same experts upon the value of the property after the taking, that they were based on the value as an improved wharf lot, and also included elements of the general appreciation of values in the neighborhood, should have been sustained.

The main question, however, is upon the effect, as to damages, of the building of the bulkhead by the railroad company on the port-wardens' line. As this was entirely outside of the strip of land taken for the right of way, the company were bound to show some authority for putting it there. Otherwise it was a trespass, for which they were not only not entitled to claim that it benefited the property, but were liable in damages. The claim made at the argument that good engineering required the bulkhead to be put where it is, only needs the obvious answer that, if so, the company should have condemned that part of plaintiff's lot, and paid for it in the regular way.

Their acquisition of the sixty-feet-wide strip for railroad pur-
poses gave them no right to put retaining walls or abut-
ments or bulkhead upon any other part of plaintiff's lot, and
all contention to that effect must be dismissed from the case.

The only authority that defendant did show was the agree-
ment of Harris, as set forth in the letter from Ellis to him,
dated October 27, 1885. It is true Harris wrote a letter in
answer, in which he made a counter-proposition which he says
was accepted, but which Ellis says was refused. For the pur-
poses of this case, it is immaterial which is right. The counter-
proposition stipulated, in a certain contingency, that the rail-
road company should keep the bulkhead in repair satisfactory
to the port-wardens. No question, as to which this would be
relevant, appears in the present case. The rest of Harris's pro-
position is no more than putting in express terms, ex majore
cautela, what was already in Ellis's letter. The terms of this
were that, in consideration of Harris, as owner, signing the ap-
plication to the port-wardens, through which alone the neces-
sary permission to build the bulkhead on the wardens' line
could be had, Ellis agreed that the bulkhead should be built
"without cost or expense to you (Harris) either for labor or
material." Harris's answer added that "any supposed benefit
to me shall not be alleged in mitigation of any damages . . . .
by reason of your taking your right of way over my property."
It was argued that the expression, "cost or expense, either for
labor or material," meant only that Harris should not be called
upon to pay out cash for the work. But this is too narrow a con-
struction. It may be a convenience to be relieved from the
necessity of a present outlay of money, but what substantial ad-
vantage is it, if the amount can be immediately afterwards de-
ducted from money which would otherwise come to the owner
of the land? If he has to pay for the bulkhead in either way,
it is cost and expense to him which the company indemnified
him against. The situation was this: The company had no
authority to put the bulkhead outside of its own right of way;
good engineering suggested that it should be put on the water
line, and this could only be done by the owner's consent; the
owner did consent on the agreement that it should be done
without cost or expense to him. The substance of the agree-
ment is that permission was given to build the bulkhead where

it would be most useful, but it was to be done without expense, direct or indirect, to the owner of the land. The fair business sense of the words is the legal sense; and to hold that he should pay for it by diminution of the damages for taking his land would be a violation of both. All consideration of the location of the bulkhead at the wardens' line must be omitted in the estimation of the damages. The same reasons require that the questions to the experts to direct their attention to the effect of the construction of the railroad, including the necessary bulkhead, within the right of way, should have been admitted. It is true that the questions assumed a condition of circumstances which never in fact existed, but the agreement under which the location of the bulkhead was changed requires that the case should be treated as if these circumstances did exist.

The presence of the sewer, even though without right, was a fact affecting the condition and value of the lot at the time of the taking by the railroad, and the evidence relative thereto was properly admitted. Whether the sewer was removed by the railroad company as a necessary incident or result of the construction of the road, or by the city in cessation of its trespass, was also a question of fact for the consideration of the jury, if there was any evidence to show that it was done by the railroad company; but the bill of exceptions, as printed, does not disclose any such evidence. The record in ejectment against the city was a step in establishing a trespass which it would be bound to discontinue, and had some bearing, therefore, on the question whether the sewer was in fact removed by the city. For that purpose it should have been admitted

Judgment reversed, and venire de novo awarded.