KATHLEEN E. TUREMAN, Individually and ROBERT W. TUREMAN and THE FIRST NATIONAL BANK OF KANSAS CITY, a Corporation, as Trustees Under the Last Will and Testament of ARTHUR P. TURE-MAN, Deceased, Respondents, v. FRANK G. ALTMAN (JR.), NETTIE B. ALTMAN, MARIE E. KESHLEAR, ANNETTE W. KIGER, VIRGINIA R. WOLCOTT and PAULINE E. WALSH, Appellants, No. 41523—239 S. W. (2d) 304.

Court en Banc, May 14, 1951.

*Charles M. Miller, Carson E. Cowherd, A. Z. Patterson, Elton L. Marshall* and *Charles E. Whittaker* for appellants; *Watson, Ess, Whittaker, Marshall & Enggas* of counsel.

*William S. Hogsett, Hale Houts, Abraham E. Margolin* and *F. Philip Kirwan* for respondents; *Hogsett, Trippe, Depping, Houts & James* and *Margolin, Kirwan & Smith* of counsel.

[306] BARRETT, C.—This is a suit in equity to value a lot in Kansas City and thereby establish its annual rental value under the terms of a ninety-nine year lease executed in 1895. The lot, on the southeast corner of Eleventh and Walnut Streets, fronts forty-eight feet on Walnut Street and 110.5 feet on Eleventh Street in the heart of the "100% downtown retail district" and with Lots 44 and 45 of Swope's Addition is occupied by the Altman Building. There are three principal or essential questions involved upon this appeal: Whether, in the circumstances, the court had jurisdiction to value the property and fix the rent; the reasonableness of the court's valuation, and, whether the valuation and rental was properly effective as of March 1, 1945 rather than the date of the court's decree in April, 1949.

The lease, known as the "Walpole Lease" was executed on the 7th day of January 1895 for a term of ninety-nine years. The owners and lessors were Richard and Hannah Walpole and the lessee was Frank G. Altman. Kathleen and Arthur P. Tureman acquired the title to the lot and Mrs. Tureman and her son, Robert, and the First National Bank as trustees under Mr. Tureman's will are the plaintiffs in this action. The defendants are Frank G. Altman's sons and daughters and the present owners of the ninety-nine year lease. There was a fruit and vegetable market on the lot in 1895 and in 1896, under the lease, the five-story [307] Altman Building was erected on Lot 46 and adjoining lots. The lease provided for an annual rental of $6,000.00 for the first fifteen years. At the termination of the first fifteen year period the lease provided:

"* * * there shall be an appraisement of the real estate above described, exclusive of improvements, such appraisement to be made by three appraisers, one to be selected by each party hereto, * * * and the third selected by the two appraisers so chosen; and the annual rental for the five years after the first period of fifteen years shall be six per cent of the valuation so fixed by said appraisers, * * *. At the end of any and every period of five years after the first appraisement it shall be the

right and privilege of either of the parties hereto, \* \* \* to demand a new appraisement of the real· estate above described, and' after each and every appraisement the annual rental for five years following or until a new appraisement has been made shall be six per cent of the valuation fixed by the appraisers at the last appraisement made as above provided; \* \* \*."

At the expiration of the first fifteen years the parties did not attempt to establish the annual rental under this provision of the lease. Instead, on March 29, 1909, Mr. and Mrs. Arthur P. Tureman and Mr. and Mrs. Frank G. Altman entered into a supplemental agreement "making certain specific amendments or alterations to said lease and \* \* \* no other changes or alterations are made in said lease." One of the amendments provided, in the event the present building should be destroyed, that the lessee in rebuilding should construct a foundation capable of supporting ·a ten-story building of steel and concrete substantially similar to the Sharp Building then on the northwest corner of Eleventh and Walnut Streets. The other amendment provided that the rent for the first ten-year term, beginning on March 1, 1910, should be $19,000.00 a year and for the second ten-year period the annual rent should be $20,000.00 a year, and thus the annual rental for the lot was amicably and mutually provided for until 1930.

Since 1930 there have been no amicable or mutual agreements between the parties concerning the rent. Instead there has been constant strife, litigation and maneuvering for advantageous position. When the lessors have accepted it the lessees have paid an annual rent of $20,000.00. In 1930 the lessors gave notice and demanded an appraisal of the lot, exclusive of the improvements, under the quoted provision of the original lease. In that attempt to appraise the property, the appraiser selected by the lessor and the third appraiser agreed on a valuation of $864,000.00 but the appraiser selected by the lessees' successor did not agree to that valuation and separately valued the lot at $589,325.00. The lessors then instituted an action to have the appraisement of the two appraisers declared to be the valid appraisement and the rent determined accordingly. The trial judge indicated that a valid arbitration required the concurrence of all three appraisers and the lessors dismissed the suit. In their answer to the suit the lessees had indicated a willingness to attempt a second arbitration and, before dismissing the suit, the lessors nominated another appraiser and again asked for arbitration of the value of the lot under the terms of the lease. The lessee nominated an appraiser but the two were unable to agree on a third and so the second attempt at arbitration failed. The lessors contend that another attempt to arbitrate in 1931 failed because the lessees refused to appoint an appraiser but it is not necessary to consider that attempt or any question concerning it. Likewise it is not

necessary to consider whether a second suit was filed in 1932. In any event, in 1919 the Merchants Realty Company succeeded to the interests of the lessee and in 1933 a corporation, Shopping Center Building Company, dominated by the lessors, acquired all the rights of the Merchants Realty Company and entered into an agreement with the lessors for an increased rental. This resulted in protracted and complicated litigation which terminated favorably to the Altmans and preserved their rights as lessees under the lease. Altman v. Shopping Center Bldg. Co., 82 F. (2) 521. In February 1945 there was another attempt at an appraisal under the lease but that appraisal failed because the three appraisers could not agree. [308] Likewise an appraisal attempted in 1946 failed when the appraisers could not agree.

In December 1947 the lessors instituted this suit. The trial court took jurisdiction of the action, valued the lot at $688,800.00 and fixed the annual rent from March 1, 1945 at $41,328.00 and retained jurisdiction of the cause so as to redetermine the value and rent at the end of every five-year period at the request of either of the parties. Upon this appeal the lessees contend that the trial court did not have equitable jurisdiction to value the property and thus change the terms of the ninety-nine year lease and in effect write a new lease for the parties merely because the appraisers selected by the parties had failed to agree, through no fault of the lessees. It is said that the court's jurisdiction "is predicated · solely upon the alleged failures of appraisements, without any fault of the lessees." Their position, in general, is summarized in their brief: "Because under the pleadings which made the lease contract a part thereof, the sole and only issue of five alleged attempts at an appraisement by appraisers selected as provided by the appraisement provision in the 99-year lease to agree to an appraisement failed due to no fault of the parties to the lease contract did not give a court of equity jurisdiction, and justify a court in taking jurisdiction * * *." In this connection it is further urged that the court erred in holding and finding under the evidence that "no appraisement of Lot 46, in the manner provided for in said lease can succeed," and erred in holding that after the supplemental agreement expired in 1930 there had been no effective agreement fixing the amount of the rent under the lease. It is contended that the appraisements of 1930 and 1932 were abandoned by the lessors who accepted the old rent of $20,000.00 a year and made no new demand for an appraisal until 1945 and that at most the court could only consider three attempts at appraisement. This is but a brief outline of the appellants' general argument but the essence of their appeal is the power and propriety, in the circumstances, of the court's assuming and retaining jurisdiction of the cause. In trying the case anew, it should be interpolated here, that certain mentioned questions neither briefed nor argued, such as

the impairment of contracts or other constitutional questions, are deemed abandoned. Wright v. Tucker, (Mo.) 137 S. W. (2) 557; Petty v. Kansas City Public Serv. Co., 355 Mo. 824, 198 S. W. (2) 684.

But, upon the essential issue, even the cases upon which the appellants rely recognize that when value and rents or other rights are made to depend upon an arbitration and the appraisal fails that a court of equity, in appropriate circumstances, may intervene and determine value and fix the rental. Tscheider v. Biddle, 4 Dill (U. S.) 55, Fed. Cas. No. 14,210. In Biddle v. McDonough, 15 Mo. App. 532, a thirty-year lease fixed the rent for the first ten-year period and then provided that the rent for subsequent ten-year periods should be determined by appraisement of the value of the property. An attempt to appraise the property failed and the court declined to assume jurisdiction and value the property but, in addition to the appraisal clause, the lease provided that if the appraisers failed to agree the lessee should pay rent ''at the rate of six per cent on the last valuation of the ground for city taxes.'' In short, the parties anticipated that arbitration might fail and they specifically provided what the rent should be in that event. But in this case there is no alternative provision, neither a standard of valuation nor a mode of fixing value and rent is provided for in the event arbitration fails. There have been several instances in which courts of equity have valued property in similar or analogous cases. Arnot v. Alexander, 44 Mo. 25; Holmes v. Shepard, 49 Mo. 600; Biddle v. Ramsey, 52 Mo. 153; Hug v. Van Burkleo, 58 Mo. 202; Strohmaier v. Zeppenfeld, 3 Mo. App. 429. They are not cited by counsel but collections of cases and discussions of the subject are contained in the following: 1 Cor. L. Q. 225; 2 Tiffany, Landlord & Tenant, Sec. 228, p. 1544; Pomeroy, Specific Performance, Secs. 149-151, p. 382; annotations 167 A. L. R. 727, 747, 763; 166 A. L. R. 1237; 68 A. L. R. 157; 30 A. L. R. 572; 47 L. R. A. (N. S.) 337; 8 Ann. Cas. 664.

[309] The difficulty is in the reasons that have been advanced for the court's jurisdiction and the general rule that courts of equity will not decree specific performance of agreements to arbitrate (49 Am. Jur., Sec. 31, p. 43; 52 C. J. S., Sec. 510, p. 314) because such contracts are too indefinite and incomplete and the courts will not substitute a new contract for that of the parties. City of St. Louis v. St. Louis Gaslight Co., 70 Mo. 69, 102-112. In avoidance of this general rule the reason usually advanced for the court's power to intervene and value property is that the agreement for ascertainment of the price is but subsidiary or incidental to the main purpose and principal contract, a matter of form rather than one of substance in which the act of the appraisers is merely mechanical. Maas Bros. v. Weitzman, 288 Mich. 625, 286 N. W. 104; Texas Co. v. Z. & M. Independent Oil Co., 156 F. (2) 862; Grosvenor v. Flint, 20 R. I. 21. But in this lease and in this case the valuation and rental clause have

become the most important and vital part of the contract and it may not be said that the provision is subsidiary or incidental. 31 Yale L. J. 670. Likewise the reason of inadequacy of remedy at law and the prevention of a multiplicity of suits (Biddle v. Ramsey, supra) does not obtain in this case because even the court's decree, in retaining jurisdiction, contemplates further disputes and more litigation. It does not necessarily follow, however, that there are not other good and sufficient reasons for the court's intervention and even temporary settlement of this controversy. This contract has been in existence for fifty-five years and no one questions its validity. There has been part performance of the contract by all the parties. Annotation 47 L. R. A. (N. S.) 337, 369. The original parties to the contract did not contemplate an abortive appraisal or a miscarriage of the appraisal provisions of the lease and, in effect, contracted for a fair valuation and a fair rental. Pomeroy, Specific Performance, Sec. 151, p. 386. "It is to be presumed that the parties contracted with reference to fair, reasonable, and practical results, and the language employed by them should have a fair, reasonable, and practical construction. While equity does not make contracts for parties, it gives construction (force) to contracts which parties make for themselves, * * *." Arnot v. Alexander, 44 Mo., l. c. 29. There has been part performance of the admittedly valid contract and both the lessors and the lessees have acquired rights that they are entitled to have enforced. Bird v. Couchois, 214 Mich. 607, 183 N. W. 36. In a renewal case it would be inequitable for the lessor to appropriate improvements or refuse to renew the lease merely because arbitration had failed. On the other hand, it would be inequitable to permit the lessee to enjoy the benefit of the premises when the rental value had greatly increased and the parties had contemplated an increased rent with increased rental value. There has been part performance throughout the years, rights have been acquired on both sides, and some preliminary modification of the contract is now necessary to fairly carry out its terms; the rental value cannot be determined as provided in the lease and it is appropriate that a court of equity enforce it as fairly as possible. Kaufmann v. Liggett, 209 Pa. S. 87, 58 Atl. 129; 1 Cor. L. Q. 225; 50 Har. L. R. 533.

The appellants have anticipated these reasons and contend, nevertheless, that the court should not intervene in this controversy. They have distinguished, on their particular facts, all the cases and say, because there was neither allegation nor proof of fraud nor of misconduct on the part of the lessees, that no court has ever intervened because of the mere failure of attempts at arbitration. It is not necessary to determine whether there were five or six attempts at appraisal or whether the appraisals of 1930 and 1931 should be considered. The mere failure of one attempt might not be sufficient (Compare: Lowe v. Brown, 22 Ohio S. 463), but the number of

attempts is certainly not the determinative factor. But the mere number of the attempts here and their failure is indeed some indication that it has become impossible to amicably settle the rights of the [310] present parties under the terms of the lease. If the present record, disregarding the previous attempts to arbitrate, demonstrates anything, it demonstrates that it has become impossible to value this land and fix a fair rental under the terms of the lease. And impossibility of performance or, more accurately, in this instance the failure and inability of the parties to carry out this one phase of their lease, irrespective of fraud or misconduct, (Tobey Furn. Co. v. Rowe, 18 Ill. A. 293) is sufficient to warrant the intervention of equity. Holmes v. Shepard, supra; Kaufmann v. Liggett, supra; Pomeroy, Specific Performance, Sec. 149, p. 382. The present parties and their witnesses do not and will not voluntarily and mutually agree to anything. Almost every qualified realtor in Kansas City has either been an appraiser for one side or the other or has valued the property so that it is now probably impossible to select a panel of unbiased, qualified arbitrators and this record fully supports the court's specific finding that "it is, manifest that no appraisement of Lot 46 in the manner provided for in said lease can succeed." There is not the slightest suggestion in this record from either the appellants or the respondents that any further efforts at arbitration would succeed.

Of course after the supplemental agreement expired in 1930 the lessees continued to pay the rent they had previously paid, $20,000.00 a year. They could not continue as lessees and not pay rent and they could not well pay some other sum not mutually agreed upon or not determined under the arbitration clause of the lease but there was "no operative or effective agreement between the parties to said lease fixing the amount of rent payable under said lease." The supplemental agreement fixed the rent for the twenty years preceding 1930 and it did not purport to do more. Since 1930 the rent was and has been in bitter dispute and the various attempts at arbitration and the protracted litigation is not such conduct as would indicate that the parties had so construed the contract. The maxims of equity are urged and it is said that the lessors' real purpose is to enforce a forfeiture of the lease and that equity should not interfere in aid of the plan of a suitor to obtain an unconscionable advantage. As we view the record neither party is in a position to invoke the maxims of equity. There has been no fraud but, as we have said, there has been maneuvering for position and advantage. The lessors have been the aggressors—their action has all been affirmative, while the lessees' conduct has all been negative and passive. The equities of the situation are that the lessees have sought to maintain a low rental, while the lessors have sought to establish a high rental and both parties have employed every means to hold or secure that monetary advantage. The original parties to the lease contemplated a

fair and reasonable rental based on the future value of the lot. They stipulated that rental for the first fifteen years and mutually agreed upon it for the following twenty years. The present parties, unlike their forebears and predecessors, have been unable or unwilling to mutually agree upon or amicably arbitrate a fair and reasonable rent. But if a fair and reasonable rental is $41,328.00 a year, as the court has found, rather than $20,000.00 a year as the lessees contend, that sum, justly, should be paid. If it becomes too onerous the trial court has retained jurisdiction to revalue the property and the lessees are not wholly without remedy.

The trial court found that the value of the lot, exclusive of improvements, was $688,800.00 and, under the terms of the lease, fixed the annual rental at $41,328.00 from March 1, 1945. It is insisted by the appellants that the court's valuation was grossly excessive and supported only by conjectures and assumptions of costs and expenses of imaginary or hypothetical buildings and not supported by the evidence. It is insisted that the court gave no weight to proof of sales of similar property in the so-called 100% retail district but considered and gave weight to incompetent, speculative evidence. The appellants do not say what the fair valuation is or what a fair rental would be but they indicate that the $20,000.00 a year, paid since 1930, is fair and reasonable.

[311] It would serve no useful purpose to set forth in detail the testimony of every witness and the mass of exhibits. It is sufficient to note in a general way the evidence before the court and to illustrate, in trying this case anew, that it is not possible for this court to confidently say that the trial court should have arrived at some other value and rental. There were charts and graphs of population growth and business trends from 1909 to 1947. There were statistics as to grain and livestock receipts, bank clearances and of every conceivable economic factor over a period of years in Kansas City. There were pedestrian traffic counts at 11th and Walnut Streets and discussions of present day retail merchandising methods. In some manner, by report if not by direct testimony, every supposed competent realtor and appraiser in Kansas City has given an opinion as to the value of the lot and its reasonable rental. There is a description of practically every piece of property in the downtown area, including the cost of the structures upon them, the rent paid for the buildings and the rent paid for the land, the nature of the occupancy and the rents paid by the tenants. There was testimony and opinions as to construction and building costs in 1930, in 1945 and on the date of the trial. The lot and the building now upon it have been described in detail and compared to every piece of property in the downtown area and to some not in the retail area.

The witnesses varied in their estimates of value from a top of $1,000,000.00 to a low of $250,000.00. Some of the plaintiffs' witnesses

gave these estimates of value: $950,000.00; $900,000.00; $864,000.00; $720,000.00 and $700,000.00. Some of the defendants' witnesses gave these estimates: $500,000.00; $490,000.00; $400,000.00 and $384,000.00. There were some discrepancies; in 1946 Robert W. Tureman filed an estate tax return indicating a value of $250,000.00 and in 1930 one of the Altmans' appraisers valued the lot at $589,325.00. A rental of $20,000.00 a year, paid since 1920, produces a valuation of $333,333.33. The trail court found the true value in 1945 to be in between the low of the plaintiffs' experts and the high of the defendants' experts and it is not possible, upon this record, to say that the court's conclusion is not supported by the evidence.

All of the plaintiffs' witnesses were of the opinion that the present building was not the lot's highest and best use; one witness was of the view the building could be modernized. The appellants compared the age of the Altman Building to many other structures and contended upon the trial, as they do here, that the present building is an adequate improvement and the lot's highest and best use. Those who thought that the building and its present occupancy was not the highest and best use of the ground projected hypothetical buildings ranging from one and two-story structures to four, five, ten and fifteen-story buildings. They considered the cost of construction of such buildings, the possible and probable expense and the income to be derived from them. The appellants contend that all the plaintiffs' estimates are based upon these "mythical" structures and therefore do not present a fair, realistic and proper guide for the determination of value. But some of the plaintiffs' witnesses carefully pointed out that this was but one factor considered and but one mode of approaching a proper value. In addition, the appellants' witnesses also projected hypothetical buildings of various types in appraising the value of the lot. And, of course, it was proper for the witnesses and the court to consider not only the present use to which the land is devoted but also the uses to which it is adapted, "the most advantageous use to which it could be put." Foley Bros. Dry Goods Co. v. Settegast, (Tex.) 133 S. W. (2) 228; Moore v. Eadie, 245 N. Y. 166, 156 N. E. 653.

In addition to all these factors some of the witnesses considered the effect of "decentralization" in retail merchandising, such as the development of the Plaza. The appellants' witnesses thought that the trend towards decentralization was detrimental to downtown values but other witnesses were of the opinion that it was positively beneficial. Various appraisers disagreed [312] as to whether the lot should be valued without considering the lease and especially the effect of the five-year valuation clause. The opinions of various lawyers were obtained and some witnesses considered it and some did not. Some witnesses thought that the revaluation clause depreciated the value of the lot, while others were of the opinion that it did not affect the lot's value. In fact it would be difficult indeed to conceive of any rel-

evant fact or factor that was not taken into consideration by some expert. In addition to the opinions of realtors and appraisers there was the testimony of people who loaned money on this type of property as well as the evidence of managers and operators of the Altman Building and of other buildings in comparable locations.

One of the appellants' principal complaints is that the court's valuation and the opinions of the plaintiffs' experts are not based upon actual sales of comparable property or lots "in the 100% retail district." Of course, actual sales of comparable property are an invaluable aid in determining value (St. Louis, K. & N. W. Ry. Co. v. Clark, 121 Mo. 169, 25 S. W. 192) but as the cases upon which the appellants rely indicate, evidence of sales of similar property is not the sole test. Mississippi & Rum River Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206; Harris v. Schuylkill R. R. Co., 141 Pa. S. 242, 21 Atl. 590. There have been almost no sales of comparable property in the downtown area of Kansas City for many years. For obvious reasons this type of property is seldom the subject of sale and so other methods of determining value must necessarily be resorted to. Foley Bros. Dry Goods Co. v. Settegast, supra. Many of the witnesses were familiar with whatever sales and transfers there had been throughout the years. In addition, the appellants introduced in evidence a picture of practically every piece of property, including the details of the transactions, that had been sold in all the downtown area of Kansas City over a period of years. Among the forty-eight sales the entire Chambers Building property sold for $900,000.00, indicating a value of the land of $387,000.00 or $7,514.00 a front foot; the Featherstone property sold for $600,000.00, indicating a land value of $498,000.00 or $5,764.00 a front foot and the Pennock Building sold for $425,000.00 indicating a land value of $365,500.00 or $15,220.00 a front foot. The court's valuation of this lot is $14,350.00 a front foot. But few of these sales were of property of comparable value and, as we have indicated, sales of similar property are but one test and the court had before it the sale of practically every piece of property in the downtown retail area and no doubt considered the sales along with all the other pertinent factors, including the fact that the fixed rental of the forty-eight foot tract on the southwest corner of 11th and Walnut, the Lillis Building, is $20,000.00 a year and that the same size lot on the northwest corner likewise rents for $20,000.00 a year.

As indicated in the beginning, this is but a brief resume of some of the many factors testified to and considered, great masses of data and information have not been detailed, but this is sufficient to illustrate that the trial court's valuation is based upon all the relevant factors and that this court, after considering and weighing the entire record, cannot confidently come to another and different conclusion.

The purpose of this suit and of the attempted appraisals in 1945 and 1946 was to fix the rent as of March 1, 1945 which the trial court

did after finding and fixing a value. The appellants contend that the lease does not provide for retroactive rent and that the trial court could not so fix the rental. They do not cite any cases in support of their position and they do not indicate a date as of which the rent should have been fixed, if the court could fix it, they merely analyze the terms of the lease and say that it cannot be construed as authorizing or requiring "that rentals established by a complete appraisal shall be paid retroactively to a date prior to such completed appraisal, because it expressly provides that 'After each and every appraisement the annual rental for five years following or until a new appraisement has been made' shall continue as established [313] and 'Provided always, that said rental shall be paid in equal monthly installments in advance.' " They contend that rent could not be paid in advance when it is not known and that it is unjust to charge them with such a rental when they have had no opportunity to adjust rentals with their own tenants accordingly. They argue that the supplemental agreement of 1909 was a substitution of agreed rent for the mandatory appraisal provision and that after 1930 the original lease provision for fixing rent remained effective without change.

We specifically find that there was no agreement between counsel for the respective parties that any valuation should be effective as of March 1, 1945. Nevertheless, it is our view that the trial court properly and appropriately fixed and made the rent effective as of that date. The essential difficulty with the appellants' whole argument is, as we have indicated throughout, that there has never been an appraisement and, except for the first fifteen years, the rent has never been fixed as provided in the lease. There has never been a "first" or any other appraisal and valuation under the lease. Arbitration failed and the court was fixing a value and a rental as of March 1, 1945 and all the evidence, from all the parties, was directed to that issue—value and rental as of that date. The supplemental agreement of 1909 specifically amended and altered the lease in the precise particulars set forth in the agreement and in no others. In that contract the original parties mutually and amicably fixed the rent until 1930 and after that date the rent was never fixed under the provisions of the lease. The trial court, in the case before it, could not anticipate a cycle of rent and it would certainly not be within the terms of the lease and the intention of the original parties to fix a rental for some period less than a five-year cycle. The present parties did not mutually agree and they could not amicably arbitrate the value and rental for the five-year cycle beginning on March 1, 1945. Their efforts at appraisal under the lease were abortive and the court was called upon to do what the parties could not do and the court, under the terms of the lease and the case presented, appropriately valued the property and fixed a rental for the five-year cycle beginning on that date. If the property had increased in value and the tenants owed an increased

rental, as the original parties contemplated, it was justly due and payable from March 1, 1945. Herrmann v. Gleason, 126 F. (2) 936, 940; Union Trust Co. v. Board of Education, 348 Ill. 256, 180 N. E. 819, 824; Tobey Furn. Co. v. Rowe, supra; Kaufmann v. Liggett, supra.

In trying the case anew upon the entire record, we have come to the conclusion that the trial court, in the circumstances, had jurisdiction to value the property and thereby fix a fair and reasonable rental and that the court has done so in a most creditable manner. Accordingly, the judgment and decree as entered is affirmed.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court en Banc. All concur.