Margaret M. JENKS, (Plaintiff) Respondent,

v.

Morton JENKS, (Defendant) Appellant.

No. 31704.

St. Louis Court of Appeals.

Missouri.

Nov. 17, 1964.

As Modified Dec. 22, 1964.

Motion for Rehearing or to Transfer to
Supreme Court Denied Dec. 22, 1964.

Application to Transfer Denied

Feb. 8, 1965.

Bartlett, Muldoon, Stix & Bartlett, St. Louis, for appellant.

Bryan, Cave, McPheeters & McRoberts, St. Louis, for respondent.

L. F. COTTEY, Special Judge.

Margaret M. Jenks, respondent herein, obtained a divorce from Morton Jenks, appellant, in the Chancery Court of Pulaski County, Arkansas, in 1956. The decree awarded respondent the custody of the four children born of the marriage, the eldest of whom, Constance, was then ten years of age. The court approved and incorporated in its decree a contract executed by the par-

ties on the eve of their divorce whereby they undertook, inter alia, to remove all foreseeable sources of future discord between them with regard to the education of their children. The precaution itself, however, has produced further dissension. In the litigation now before us the[d] validity of the provisions relating to the children's education is challenged. Those provisions were contained in Paragraphs 8 and 9 of the contract, reading as follows:

"8. The parties shall consult with each other regarding the education of the children and when a child is ready to enter the eighth school grade the parties shall mutually agree in writing upon the school such child shall attend. It is contemplated that each of the children shall have an opportunity to attend an Eastern school, college or university. If the parties are unable to agree upon the school to be attended by any child, the matter will be submitted to arbitration, as herein provided.

"9. If the parties are unable to agree upon the selection of summer camps as provided in Paragraph 5, or upon schools or colleges as provided in Paragraph 8, the matter shall be submitted for determination to three arbitrators, one selected by the husband, one by the wife, and one by the presiding judge having jurisdiction in domestic relations matters in the judicial district where the children reside. Determination of any two arbitrators shall be final and binding on the parties."

The decree closed with this recitation: "The court retains jurisdiction for the purpose of enforcing this decree."

Following the divorce both parties, with the children in the custody of their mother, removed to St. Louis County, Missouri, where they have since resided. In advance of Constance's seventeenth birthday, and in anticipation of her eligibility at that time to apply for enrollment in an Eastern boarding school, appellant invited respondent to discuss with him the selection of the school which the child should attend. Respondent declined, asserting that the provisions of the decree in that particular were unenforceable. Thereupon, as a first step in obtaining a judicial resolution of the dispute, appellant filed in the Circuit Court of St. Louis County a petition praying for the registration of the Arkansas decree under the provisions of our Uniform Enforcement of Foreign Judgments Law, Sec. 511.760, V.A.M.S. His petition was allowed, the decree was ordered registered, and the cause was assigned to the Domestic Relations Division of that court. On the same day, in that Division, appellant filed a motion denominated "Defendant's Motion for Order to Enforce Decree of Divorce, or, in the Alternative, for Modification of Decree." This motion (a) recited the entry of the Arkansas decree and its subsequent registration in Missouri, (b) directed the court's attention to Paragraphs 8 and 9 of the contractual provisions incorporated in the decree, (c) averred the desirability of making a prompt selection of an Eastern boarding school to be attended by Constance, (d) complained of respondent's refusal to discuss that question, (e) voluntarily conceded that the arbitration procedure set out in Paragraph 9 of the contract was "wholly unenforceable," (f) declared that for that reason "defendant has no remedy to enforce said decree with respect to the education of Constance otherwise than by this motion," and (g) concluded with a prayer that the court require the parties to meet and discuss "in good faith" the selection of an appropriate Eastern boarding school for the child to attend, and, in the event of their inability to agree, that "the Court make the decision as to school attendance, and, if appropriate, make such selection for the parties and direct the parties and each of them to sign an application for such admission and enrollment,"—and for such other relief "as to the Court may seem best for the interests of said child."

Respondent countered with a motion to vacate the order directing the registration

of the Arkansas decree because it "is not entitled to be registered under the Uniform Enforcement of Foreign Judgments Law," and to dismiss appellant's motion for enforcement or modification of the decree for the reasons (a) that "the relief sought by said motion is beyond the jurisdiction of this court to grant," and (b) that "said motion wholly fails to state any claim upon which relief can be granted."

On the basis of the record made by those pleadings the trial court summarily sustained respondent's motion and dismissed appellant's. The grounds upon which that ruling was based were not specified. This appeal ensued.

To sustain that portion of the trial court's ruling vacating the registration of the decree, respondent advances the proposition that the Arkansas court still retains jurisdiction of all aspects of the case involving the welfare of the children, expressly to enforce the decree on their behalf and inherently to modify it as their interests may from time to time require; hence, that to that extent the decree is *not final* and is therefore not entitled to full faith and credit, an essential prerequisite to its registration. From that premise, by a process of reasoning more distinguished by fervor than by clarity, respondent concludes (a) that registration of the decree in Missouri would have the effect of investing it with the quality of finality which it otherwise lacks, (b) thereby precluding a Missouri court from afterwards modifying it in any particular involving the welfare of the children, with the result (c) that any court authorizing the registration of the decree, or lending its countenance to that procedure, "would, in essence, abrogate its position and honored function of parens patriae of Constance Mathews Jenks."

We do not share respondent's apprehensions. Essential to the unhappy consequence she foresees is her assumption that a divorce decree cannot be said to be final as to any aspect of the adjudication over which the rendering court retains supervisory control. We think the assumption is not allowable. Every adjudication affecting the custody of the parties' children in such cases is necessarily prospective in its operation and, by reason of that very quality of prospectiveness, is subject to future review and modification in the light of changed conditions. Indeed, a court has no jurisdiction to render an immutable decree settling for all time the custody and welfare of the parties' children. In re Krauthoff, 191 Mo.App. 149, 177 S.W. 1112, 1119; 27B C.J.S. Divorce § 317(1) a, p. 521. But that circumstance, or that peculiar incident of divorce decrees, has never to our knowledge been held to destroy the final and conclusive character of the decree. On the contrary, the rule is that the decree is not deprived of "the usual attribute of conclusiveness" even though the award of custody (a) "is made subject to the further order of the court," or (b) is by statute made subject to the court's continuing control, or (c) is based upon an agreement between the parties. 27B C.J.S. Divorce § 316e (2), p. 509; 9 R.C.L., § 293, p. 477. Following that rule this court In re Leete, 205 Mo.App. 225, 223 S.W. 962, 966, held that under Section 1, Article 4, of the Constitution of the United States, a Massachusetts divorce decree was entitled to full faith and credit in Missouri, " * * * not only as a decree of divorce dissolving the bonds of matrimony previously existing between petitioner and respondent, but as an adjudication concerning the custody of the children and the fitness of each parent thereof, in respect to all matters pertaining thereto up to the time of the rendition of said decree." See, also, Wood v. Wood, 241 Mo.App. 367, 231 S.W.2d 882, syll. 2. And, for whatever collateral interest it may have, it is an undeniable fact that a Kansas divorce decree providing for monthly payments by the husband to the wife for the support of a child whose custody was awarded to her has actually been "duly registered" in Missouri under the Act, notwithstanding such provision was obviously prospective in its operation and subject to future modifica-

tion by the rendering court upon a showing of changed conditions. Mangold v. Mangold, Mo.App., 294 S.W.2d 368.

No authority cited by respondent, and none discovered by our own research, contains any principle suggestive of the rule for which she here contends, or any pronouncement in conflict with the views we have expressed. Our conclusion is that the Arkansas decree was final, in every proper sense of the word, and was entitled to full faith and credit in Missouri; that it was therefore properly registered under the Act and must henceforth be regarded as a final decree of the Circuit Court of St. Louis County, to the same extent and with the same effect as though originally rendered by that court. Mangold v. Mangold, supra, 1. c. 369. Accordingly that portion of the trial court's order vacating the registration of the decree is reversed.

We have next to consider whether the decree should be enforced in respect of the provision relating to Constance's attendance at an Eastern boarding school, and, if so, upon what principles. And to the end that the question may receive the consideration to which the excellence of the briefs entitles it, we propose to develop the inquiry along parallel lines, on the one hand to decide whether appellant is entitled to enforcement as a matter of right, that is, on the basis of established principles of equity in the application of which the child's welfare is not of primary concern, and on the other to determine whether, out of solicitude for the child's welfare, we should give effect to the provision in question even though some modification of the decree may be necessary to accomplish that result. Preliminarily, to dispose of three incidental questions raised by respondent, we will say:

(a) That we do not regard the issue in this case as moot simply because the term of school has expired at which appellant sought to compel Constance's enrollment. There will be other terms that will serve as well. Moreover, the rights of the parties with respect to the education of their other children will necessarily be tested by our decision here. In all its material aspects, therefore, the controversy remains alive. Relief is not to be denied merely because the court's determination of its propriety is unavoidably delayed; for justice, despite Lord Coke's claim for the courts of the fairs of his day, cannot always be "done as speedily as dust can fall from the foot." And if those reasons were to be deemed inadequate, then, having regard for the novelty of the question and the possible public interest in its solution, we would exercise our "right of unlimited discretion" to complete our deliberation of the case and enter a final judgment on its merits. State ex rel. Donnell v. Searcy, 347 Mo. 1052, 152 S.W.2d 8, 10.

(b) That we do not regard the use of the word "contemplated" in Paragraph 8 of the contract, or any other word there employed, as having introduced into its language such a degree of ambiguity as to render it unenforceable on that account. Denker v. Twentieth Century-Fox Film Corp., 26 Misc.2d 1035, 210 N.Y.S. 241.

(c) That we do not regard the proposed modification of the decree in this case as working any change in the physical custody of the child, since it relates only to a detail of her education; hence it is unnecessary that appellant's request for it be accompanied by proof of a change in conditions since the entry of the original decree. Mathews v. Mathews, Mo.App., 337 S.W.2d 529, 533. "In proceedings of this character, where the welfare of minor children is at stake, no technical rules of objection should be given serious consideration * * *." Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458, 460.

And before entering upon the main inquiry it may also be well to review some general principles which bear, with varying degrees of directness, upon the issue before us. For instance, it seems to be well settled that in a divorce case the court

is permitted, at the invitation of the parties or with their consent, to adjust the property rights of the spouses and to prescribe for the welfare of the children to an extent and in a manner that would not otherwise be allowable. Crews v. Mooney, 74 Mo. 26; McDougal v. McDougal, Mo.App., 279 S.W. 2d 731, 739; Landau v. Landau, Mo.App., 71 S.W.2d 49, 50–51; Luedde v. Luedde, 240 Mo.App. 69, 211 S.W.2d 513, 517. And when the court, in response to such an invitation, disposes of those collateral issues by incorporating in its decree the provisions of a contract which the parties have reached on the subject, the contract becomes merged in the decree and the decree is to be regarded as a "judgment by consent." Luedde v. Luedde, supra, 211 S.W.2d 1. c. 517. Thereafter the contractual provisions are to be enforced as an order of the court, and may be reformed or amended only by a modification of the decree. 27B C.J.S. Divorce § 301(2) a, p. 411 et seq. But all of this presupposes a contract sufficiently complete and definite in its terms to have been independently enforceable, for the doctrine of merger will not be carried any farther than the ends of justice require, 50 C.J.S. Judgments § 599, p. 22, " * * * and the court has no power to add conditions or provisions on which the parties have not agreed," 49 C.J.S. Judgments § 177, p. 314. Moreover, "Since a judgment by consent is regarded as a contract between the parties, it must be construed the same way as any other contract," 49 C.J.S. Judgments § 178, p. 314, " * * * and, when the essential rights of the parties are influenced by the original contract, the court will look behind the judgment for the purpose of ascertaining what the original contract was," 50 C.J.S. Judgments § 599, p. 23; State ex rel. Pullum v. Consolidated School Dist. No. 5, Mo., 233 S.W.2d 702, 705; Ballard v. Standard Printing Co., 365 Mo. 552, 202 S.W.2d 780, 782. Finally, in a proceeding of this nature, possessing as it does, so many of the incidents of an equitable proceeding, we should, wherever appropriate, apply equitable rules. Link v. Link, Mo.

App., 262 S.W.2d 318, 320; I. v. B., Mo. App., 305 S.W.2d 713, 722.

■ Turning, now, to the first phase of the inquiry, and confining it for the moment to the contract itself, it will be seen that Paragraph 8 divides easily into three parts: (a) an acknowledgment of the parties' harmony of purpose in proposing that Constance be educated at an Eastern school; (b) a declaration of their intention to select the particular school by future agreement between themselves; and (c) the adoption of the arbitration procedure outlined in Paragraph 9 as the method by which such selection should be made in the event of their inability to come to agreement on it. We are relieved of the necessity of discussing the arbitration procedure, however, by reason of appellant's formal admission that it is "wholly unenforceable," a position he took in the trial court and has since maintained here. He predicated that concession on Sec. 435.-010, V.A.M.S.; but we will add that it has long been the law in Missouri that agreements to arbitrate will not be specifically enforced by courts of equity. King v. Howard, 27 Mo. 21, 25; Tureman v. Altman, 361 Mo. 1220, 239 S.W.2d 304, 309, 26 A.L.R.2d 729. The contract must therefore be construed as though Paragraph 9 (and all reference to it in Paragraph 8) was deleted from it. What remains, then, of Paragraph 8? Nothing, we think, that is identifiable as a contract; nothing that is susceptible of enforcement in any way by any court on any principle known to the law of contracts. What we have left is an indication that at the time the document was drafted the parties had in mind the possibility, or even the probability, that it would be to Constance's advantage to attend an Eastern school when she arrived at the proper age; that was what was "contemplated." But implicit in that notion, and inferentially confirmed by the other recitations, was the thought that until the child reached the age for enrollment and by her approach to maturity placed her parents

in possession of more certain knowledge as to the nature of her talents and the direction of her inclination, and hence in a position to choose the particular school best suited to her aptitude, it would be improvident to specify a choice. It was the designation of the particular school, made in the light of that knowledge, that was the ultimate object of the contract, just as it is the ultimate object of appellant's motion. But it was not secured by the contract. On the contrary, it was deliberately reserved for future negotiation and, failing that, for arbitration. We have nothing, therefore, except *an agreement to agree in the future* on the single material object the parties intended to accomplish. Such an agreement is a nullity. "An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto." Rosenfeld v. United States Trust Co., 290 Mass. 210, 195 N.E. 323, 122 A.L.R. 1210, 1216. "There can be no contract so long as the essential terms thereof are reserved for the future determination of both parties." Brown v. Childers, Mo.App., 254 S.W.2d 275, 281. "Unless all the terms and conditions are agreed on, and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect * * *," 17 C.J.S. Contracts § 49, p. 702; and again, at p. 704, "Where an essential element is left for future agreement, there is no contract * * *." The most that could be said for the agreement in this case, if we were inclined to go that far, is that it imposed a moral obligation on respondent. But, "In a proceeding in equity, as this case at bar is, a court of equity cannot decree specific performance of a moral duty, cannot enforce a duty that is one of conscience." Brewer v. Cary, 148 Mo.App. 193, 127 S.W. 685, 692.

We shall not concern ourselves with the provision requiring the parties to "consult with each other regarding the education of the children." Consultation without eventual agreement would be fruitless; and since agreement cannot be compelled, equity will not indulge the futility of ordering the parties to "meet together" to discuss "in good faith" the very problem on which they have demonstrated their inability to agree. 81 C.J.S. Specific Performance § 14, p. 438 and § 16, p. 439; 30 C.J.S. Equity § 13, p. 333. Our conclusion is that the parties' contract, in the particular under consideration, was wholly unenforceable.

The decree is in no better condition. It simply carries forward and incorporates the infirmities of the contract. It provides no method for the enforcement of that portion of it in which Paragraph 8 is merged, aside from the sterile arbitration procedure. There is no alchemy in the doctrine of merger by which a court can transmute into a valid and enforceable provision that which is otherwise invalid and unenforceable. We are not invited to resolve the issue by resort to the court's inherent punitive powers, as, for instance, by citing respondent for contempt; and we would in any event refuse to do so. Such a procedure could result only in coercing respondent's acquiescence in whatever decision appellant chose to insist upon, an event neither within the contemplation of the parties nor within the power of the court to compel in the proper exercise of its prerogatives. 17 C.J.S. Contempt § 32, p. 89. As the decree now stands, therefore, that portion of it in which Paragraph 8 of the contract is merged can only be carried into effect by the voluntary act of the parties. Appellant is not entitled to enforcement of the decree as a matter of right; in fact, absent a material modification it is not enforceable at all.

We address ourselves, then, to the second phase of the inquiry: Whether, out of solicitude for the child's welfare, we ought to modify the decree so as to give effect to the intendment of Paragraph 8 by arbitrarily designating the school ourselves which Constance shall attend. The rule with respect to the modification of decrees based upon contracts is that where the subject of the contract is one which the parties are authorized to dispose of finally

by that method, as, for instance, by substituting a voluntary undertaking for an award of alimony, the decree may not be modified in such a way as to change the contractual obligations of the parties. North v. North, 339 Mo. 1226, 100 S.W.2d 582, 587, 109 A.L.R. 1061; Davis v. Davis, Mo.App., 196 S.W.2d 447, 452. A different rule prevails, however, where the object of the contract, and hence of the decree in which it is merged, is to provide for the welfare of a child of the divorced parties. On that subject it is well settled that no contract of the parties will be binding and no decree of the court immutable, but the one may be disregarded and the other modified from time to time as the welfare of the child may require. Green v. Green, Mo.App., 234 S.W.2d 350, 351; Messmer v. Messmer, Mo.App., 222 S.W.2d 521, 524; 27B C.J.S. Divorce § 311, p. 475, and § 317(1) a, p. 521 et seq. There is no magic in that phrase, "welfare of the child," however. It is no open sesame to unbridled judicial discretion; it is no talisman by which the court's jurisdiction can be stretched beyond its limits. Perhaps this is as good a place as any to comment on the subject.

From the frequency with which "welfare of the child" has been stressed by the courts as the basis for all decisions affecting its custody, and from the insistence with which it is urged by the litigants upon any pretext, both at the time of the making of the award and on the occasion of every subsequent modification of it, the impression seems to have been conveyed that it is the only consideration to be reckoned with in reaching those decisions. The language of some of the cases, being either too loose or too cryptic, lends color to that view. But it is misleading. The protection of the child's welfare has indeed been the object of the courts in custody cases from earliest times; but the attainment of that object requires the observance of principles considerably more practical and less nebulous than a mere declaration of beneficent purpose. Long experience with wardships has taught the courts that in this field (as in most others) a prudent regard for their own limitations is essential to the orderly discharge of their duties. Courts are not so constituted as to be able to regulate the details of a child's upbringing. It exhausts the imagination to speculate on the difficulties to which they would subject themselves were they to enter the home or the school or the playground and undertake to exercise on all occasions the authority which one party or the other would be bound to ascribe to them. Considerations of the most practical kind, therefore, dictate that in these cases the duty of attending to the details of the child's rearing be delegated to a custodian, and, as an indispensible concomitant of the appointment, that the custodian be vested not only with commensurate authority but with that degree of discretion upon which the expeditious exercise of authority invariably depends. It must be presumed in the absence of a contrary showing that the custodian, whether he be the child's parent or a stranger, will discharge his duties with fidelity and good judgment. If he fails, the remedy is to remove him, not to retain him as a mere figurehead. Surveillance of his activities, however close, will never supply his lack of interest or his want of judgment. Accordingly, the court in its original decree ought not specify, nor afterwards by modification prescribe, the manner of the performance of his duties with such particularity as unnecessarily to abridge his discretion. In fact, once the responsibility has been delegated, no further decision should be required of the court save to prevent the abuse of the child or the neglect of his essential interests. Thus, while the court ought continually to supervise the decisions of the custodian, it ought only rarely to dictate them. Any other policy will surely oblige the court to assume every responsibility which it denies the custodian the discretion to discharge, and, in its farthest extension, substitute judicial paternalism for custodial responsibility.

In this case the education of Constance at an Eastern boarding school is urged upon

us as a matter directly involving her welfare! Education is an important aspect of every child's welfare, to be sure, and there is no doubt we have supervisory control over it. Equally important to the child's welfare, or surely hardly less so, is her health and diet, her social and moral training, and so on, over which we also have supervisory control. But is it to be supposed that in the proper exercise of our authority we could, upon someone's objection to her diet, prescribe oatmeal for her breakfast, or an apple a day? Or that, upon complaint being made to us, we could require that she be instructed in the niceties of etiquette, or denied access to the bulk of modern novels? Or that, upon the point being called to our attention, we should direct her custodian to have her vaccinated for smallpox, but only at a private hospital? Upon what basis, then, can we justify our designation of the particular school she shall attend? And if we were to find in that detail an expedient for the exercise of our authority, how should we then avoid being called upon to decide her course of study, or how evade our like responsibility for dictating the time to be spent in the preparation of each lesson?

We are dealing with a decree which awarded the custody of Constance to respondent with no (legally enforceable) restraint on her right to select whatever school she deemed best suited for the child's education. It is stated in the briefs that Constance is attending Mary Institute in St. Louis. Whether that be true or not, it is fairly inferable that she is attending *some* school, and appellant makes no complaint as to the adequacy of the instruction she is receiving there. Judicial conscience is satisfied, and judicial interest exhausted, when it appears that the child is being afforded an education reasonably adapted to her capacity and aptitude, at an accredited institution of the general class to which other children of her background and means have access. If it should develop at any time that Constance is being denied

an education substantially in conformity with those standards, it will be appellant's privilege, indeed his duty, to approach us with the problem. But the record before us gives no cause to apprehend that respondent will be derelict in her duty to her daughter, and no excuse for engaging in what could otherwise amount to nothing more than an unwarranted interference with her discharge of that duty.

So much for the decree as written. As it is correlative to our inquiry and illustrative of our point of view, however, it may not be inappropriate to say that in our opinion the decree would have been equally unenforceable even if the contract on which it was based had either (a) specified the particular school which Constance should attend, or had (b) required respondent to make that selection at the appropriate time from a suggested list or from the general category known as "Eastern boarding schools:" (a) Upon the first hypothesis, because the making of such an agreement by the person afterwards to be entrusted with the child's custody, and at a time when the immaturity of the child made the designation of a preparatory school for her patently imprudent, would amount to a bargaining away of the child's best interests, and an advance abdication by the custodian of all responsibility in that particular—and this in favor of one who, having been denied the child's custody, could thereafter have no authoritative voice in her upbringing. (b) Upon the second hypothesis, because the selection of an appropriate school for the child from any list would necessarily require respondent to exercise intelligent judgment and sound discretion—and while that may be expected of her as the child's custodian, equity cannot compel it as a contractual obligation.

Appellant relies on Mathews v. Mathews, Mo.App., 337 S.W.2d 529, as opposing the views expressed in this opinion. In the Mathews case the decree awarded custody of the children to the wife and provided (evidently on the basis of a contract between the spouses) that the husband should

pay the tuition for the attendance of each child at such school as the parties might select by future agreement between themselves, "and in case of inability to come to agreement they shall resort to the court for its decision." Thereafter the wife proposed to send one of the children, Patricia, to Mary Institute, but the husband, although conceding that Mary Institute was in all respects an excellent school for the child to attend, refused to give his formal assent unless the wife would consent to a drastic modification of other provisions of the decree. This she declined to do. In the face of that impasse she enrolled the child in Mary Institute on her own responsibility, and then filed a motion in the original suit to compel the husband to pay the tuition which he was admittedly able to afford. We were at some pains to point out in our opinion in that case that the husband did not challenge the authority of the trial court to insert the provision in question in the original decree. Neither its propriety nor its enforceability was at issue. We simply held that, where an admittedly proper decision on the subject of the child's schooling had been made by her custodian, the husband's consent to the arrangement was not a prerequisite to the court's approval of it; that the withholding of his consent could not excuse his refusal to pay the tuition. In so holding we conformed to the principles expounded in this opinion, although it is true we did not make specific reference to them. The issue in the Mathews case could have been decided with the same result by simply declaring the decretal provision in question to be void. And no doubt that would have been the decision had its validity been questioned. In any event, however, the opinion in that case is not to be construed as conflicting with the principles approved in this, but rather as being in harmony with them in all essential respects.

Respondent relies on Brewer v. Cary, 148 Mo.App. 193, 127 S.W. 685, as supporting the views expressed in this opinion. In that case we were required to pass upon the enforceability of an antenuptial contract wherein the spouses had agreed that any children born of their marriage should be reared in the Catholic faith. Agreements of that type have almost uniformly been held to be unenforceable, 11 Ala. Law Review 354, and that was our holding. The case is not sufficiently in point to constitute a true precedent, but in the course of deciding it we made some observations that are pertinent here. For instance we said, 127 S.W. 1. c. 688, " * * while the education of the ward will be directed by the court to be suitable to his prospects and condition in life, 'the manner and course of the education and of its details are left to the judgment and discretion of the guardian' * * *." Again, 1. c., 689, " * * * the appointment of a guardian, or leaving the infant in the care of its parent, commits to the natural or appointed guardian the determination of matters of education, both secular and religious * * *." And again, 1. c., 689, we declared the rule to be " * * * that he to whom is committed the custody of the infant is the one to direct its training and education, and that, if it is shown that he is not the proper party to be charged with this trust, he is to be removed from the trust." And yet again, 1. c., 690, "In no case have any of our courts directed a guardian remaining in control and custody of the ward, whether that guardian is the father, mother, or one appointed by the court, as to what particular course of education or training, secular or religious, is to be pursued." And finally, 1. c., 692, " * * * the right of custody as guardian, whether natural or by appointment of law, carries with it, as one of the incidents involved, the right as well as the duty to direct its training, its education, religious and secular, its conduct—in fact, confers the right of a parent, with all its incidents— that these are of the very essence of the appointment of guardians, and lie at the foundation of the right of custody itself; that no court will interfere directly in di-

recting such matters, save when convinced that the welfare of the child demands it."

We regard those comments from the Brewer case as being in accord with the views expressed in this case and with the rule appearing in 17A Am.Jur., Sec. 831, p. 23, where it is said: "The court will not compel the parent awarded and retaining the custody of a child to send it to a boarding school, or even to a private day school. The custodian is the one to decide the extent of the education of a child beyond that provided by the state school system."

Only two other cases of the many that have come under our scrutiny are sufficiently in point to merit notice here. One did not mention (and may therefore be regarded as having implicitly rejected) the principles we have reviewed; the other approved them. In Belknap v. Belknap, 265 Ky. 411, 96 S.W.2d 1012, the court granted a divorce to the husband on appeal, but awarded the wife the custody of the children during the school year, and then inserted in its decree without discussion this provision, 96 S.W.2d 1. c. 1013: "In case of disagreement of the parties as to where the children shall attend school, the matter will be submitted to and determined by the chancellor." Our opinion of that provision has been made sufficiently clear. In Bennett v. Bennett, Fla., 73 So.2d 274, the court had before it for review a decree of the trial court awarding custody of the children to their father, with a further provision requiring him to place them in a boarding school to be selected by agreement of the parties, and, in the event of their failure to agree, by the court. The appellate court said, 1. c. 279, " * * * we can find no basis on which we can approve this provision in the instant decree. The husband has the right to send the children to either public schools or private schools and we are of the view that, in the absence of most unusual conditions, it is not within the power of the court to tell the parents what schools their children shall attend." With that we agree.

It follows that the dismissal of appellant's motion for enforcement or, alternatively, for modification of the Arkansas decree was proper, and that portion of the learned trial judge's order is therefore affirmed. That portion of the order vacating the registration of the Arkansas decree is reversed.

RUDDY, P. J., and ANDERSON, J., concur.

WOLFE, J., not participating.