William R. POWELL, Appellant,

v.

Elizabeth P. KENNEDY, Executrix of the
Estate of Fred T. Kennedy, Deceased, and
John P. Kennedy, Trustee of the Fred T.
Kennedy Trust, Respondents.

No. 55711.

Supreme Court of Missouri,
En Banc.

Feb. 8, 1971.

Rehearing Denied March 8, 1971.

David Collins, Hadley E. Grimm, Collins & Grimm, Macon, for appellant.

Terence C. Porter, Columbia, for respondents, Welliver, Porter, & Cleveland, Columbia, of counsel.

MORGAN, Judge.

Plaintiff sued for specific performance of what he claimed was an absolute option to purchase 110.70 shares of the common stock of Columbia Brick and Tile Company, a Missouri corporation. Upon entry of judgment for defendants, plaintiff appealed to the Kansas City Court of Appeals. We sustained plaintiff's application for transfer and now review the case "as on original appeal." Rule 84.05 (h), V.A.M.R.

Prior to August 4, 1950, one Fred T. Kennedy, now deceased, acquired an option to purchase all of the outstanding stock of the named corporation. On that date, Kennedy and William R. Powell, plaintiff herein, entered into the contract which is the subject of this controversy. It provided, generally, (1) that Kennedy would exercise his option to purchase from others, (2) that Powell would purchase forty-five percent of the stock and Kennedy would retain fifty-five percent, (3) that additional financing would be obtained through an R.F.C. loan, (4) that "It is the desire of both of us that better utilization be made of fireclay deposits on company's property with production of refractories to begin in a modest way as soon as possible," (5) that "It is agreed that capital expenditures for plant will be made primarily out of operating profits and not out of borrowings or stock sales," (6) that "* * * Kennedy and * * * Powell agree that each will devote his full time and energy to the furtherance of affairs of the company * * *," (7) that "* * * Kennedy will devote his principal time to general management affairs with special attention to sales, financial matters and general office, (8) that "* * Powell will be especially responsible for plant operations, (9) that "Each will consult freely with the other and assist each other to the fullest extent possible."

The proper meaning of the last paragraph of the agreement is the crux of the dispute. It, verbatim, provided:

"It is agreed that in the event of death of either F. T. Kennedy or W. R. Powell that the survivor will have first option on purchasing an amount of the others stock sufficient to give him control of the company through stock ownership at a fair value as may be determined by competent outside certified accountants."

It is agreed that the contract was drafted and executed by the parties without the services or advice of an attorney; and, that the wife of each signed the instrument as a witness only.

By stipulation, it is further agreed: (1) that Kennedy had on December 3, 1965, transferred 960 shares to his son, John P. Kennedy, as trustee, for a recited consideration of $10.00; (2) that Kennedy died on April 4, 1966; (3) that at the time this lawsuit was filed stock ownership was as follows:

| | |
|---|---|
| Estate of Fred T. Kennedy, deceased | 1.00 |
| John P. Kennedy, as trustee of the Fred T. Kennedy Trust | 960.00 |
| John P. Kennedy, as an individual | 30.25 |
| Elizabeth P. Kennedy, as an individual | 22.50 |
| Elizabeth L. Kennedy, as an individual | 1.00 |
| William R. Powell | 810.00 |
| Pauline Powell | 20.25 |
| Total shares outstanding | 1845.00 |

(4) that plaintiff must acquire 110.70 shares (6%) if he is to have sufficient stock ownership to exercise control.

It is also conceded that upon the death of Kennedy, Powell made a demand for the purchase of 110.70 shares which to this date has been refused by the defendants.

■ Necessarily, we first consider what, if any, right to such shares Powell, as the survivor, has by virtue of the agreement of August 4, 1950; and if his claim thereto is sustained, we must then consider whether or not it is susceptible of being specifically enforced. To do this, we must construe the paragraph relating to the questioned option.

On the first question, defendants submit that: "It is the defendants' position that the above quoted words [first option] constitute at most, only a preemptive right or a conditional option, exercisable, if at all, only in the event that the defendants decide to sell any of the stock now or heretofore owned by F. T. Kennedy or his estate." To the contrary, plaintiff asserts that use of the words "first option" does not "automatically conclude the matter," and that we must look to the "intent of the parties to ascertain the true meaning of the contract." In any event the parties recognize the distinction between an option to purchase and a right of preemption or right of first refusal. Beets v. Tyler, 365 Mo. 895, 290 S.W.2d 76; Barling v. Horn, Mo., 296 S.W.2d 94; McCrory v. Brinckmann, Mo., 388 S.W.2d 883.

Although our task requires that we resolve what Kennedy and Powell intended by the wording of the entire quoted paragraph, we, as did the parties, first look to the words "first option." In at least two cases, this court has considered use of the words "first option" in contracts contemplating possible sale and purchase of property. Stein v. Reising, 359 Mo. 804, 224 S.W.2d 80; DeWitt v. Stotts, Mo., 265 S.W.2d 398. Both involved parties standing in a landlord-tenant relationship. In each it had been provided that the lessee would have a "first option" to purchase, and in each the court ultimately found that only a pre-emptive right had been

given. However, of more immediate importance is the approach taken by the court to the comparable problem submitted. In each instance, the words used were considered (1) apart from their context, (2) in the context of the agreement and (3) in light of the extrinsic circumstances. However, at this point, it should be noted that although we reaffirm and intend to follow the guidelines of both the Stein and DeWitt cases, we believe they are factually too different to be controlling in the instant case. For instance, each of the lessees was interested in his lessor only in so far as he owned the premises being used, whereas in the instant case many additional factors are involved, i. e., mutuality of investment, work and hope.

In our effort to determine the actual intent of the contracting parties, we must seek to re-establish the circumstances under which it was executed. It appears that Powell was a professional engineer, having graduated from the Missouri School of Mines at Rolla, with degrees in Ceramic and Metallurgic Engineering. Over the next twenty years, after graduation, he was employed by companies engaged in related fields, and at the time of entering into the contract on August 4, 1950, was general superintendent of the Mexico Refractories Company. He resigned from the latter position to enter the business venture with Mr. Kennedy who was also a professional engineer and graduate of the University of Missouri. His exeprience was in the engineering field but it does not appear to have included the manufacturing of brick and tile. As noted, Kennedy originally had an option to purchase all of the stock of the Columbia Brick and Tile Company, but the parties disagree as to the motivating factor that brought the two men into the common endeavor. Defendants suggest that Powell was only "fortunate" to have survived the man [Kennedy] who had given him an opportunity to own forty-five percent of a successful business; whereas, plaintiff submits that "Mr. Powell and Mr. Kennedy needed each other in this venture, and they contem-

plated joint control, joint efforts and joint responsibility * * * Each needed the talents of the other." Possibly neither argument is solely without merit, and we will proceed to reach our own conclusion.

First, when the words "first option" are taken out of context and viewed alone, it is established that they mean a pre-emptive right or privilege of first refusal and not an absolute option as shown by both the Stein and DeWitt cases, supra, and the cases therein discussed. If this were the only point for consideration, and it be assumed that the parties were cognizant of the legal significance of the term used, defendants should prevail. However we are faced with the contention that the contract in question was written and signed by the parties without the advice and counsel of an attorney, and that the actual intent was to give the survivor an absolute option to continue control. Although the absence of legal advice has been mentioned often in cases pertaining to construction of written documents, we have found none that sought to specifically articulate the significance thereof. It is sufficient to say, however, that it is somewhat apparent that after noting the absence of legal advice, courts more readily look to the other factors mentioned.

Second, we turn to other provisions of the contract to see if they shed any light on the intent of the parties when they agreed to the paragraph in question. From those portions of the agreement already quoted, it is clear that the parties contemplated a mode of operation more consistent with the usual partnership than that of a corporation. Certainly, Kennedy had more voting shares and from a purely legal standpoint had technical control of the corporate structure. However, this fact does not defeat the obvious conclusion that control as such was to be exercised through the cooperative effort of both men. In addition to the provisions quoted, the agreement considered the possibility of need for further working capital, and, notwith-

standing the difference in percentage of stock owned, each agreed to put in the same amount of money if required. Further it was agreed that to improve the cash position of the business, each agreed to draw the same modest salary. All of which necessarily tends to show that Powell not only demanded participation in management control, but that Kennedy as majority stockholder agreed and accepted Powell in such a capacity. As is generally true, we do not find any specific definitive explanation of the questioned paragraph while looking at the instrument as a whole. However, the provisions mentioned consistently tend to emphasize that Powell and Kennedy considered joint control something which they could live with and enjoy together. In this connection, it is significant that neither the questioned paragraph, nor any other provision of the entire contract, suggested that either man contemplated relinquishing control to strangers to the contract—be they heirs or otherwise. If it had been so intended, undoubtedly there would have been some expression calling for a promise to also consult and share decisions with the heirs or successors of either. As previously discussed, the words "first option" standing alone would give the survivor only a preemptive right to purchase. This right would remain in abeyance until such time as there was an offer to sell. As argued by plaintiff, it is obvious neither Powell nor Kennedy could make a decision to sell after either had died, so the would-be option was worthless unless some binding obligation was placed on the heirs or successors of either. Since the agreement does not so provide, nor suggest the possibility, the contract as a whole tends to sustain Powell's argument he was to have an absolute option in the event Kennedy predeceased him.

Third, we look to the extrinsic or surrounding circumstances in so far as they aid in our task. In so doing, we need not repeat all the facts that brought the two men together. However, the agreement not only

called for investment of money, which alone would not be too significant on the precise issue involved, but for a lifetime of work and dedication to the task of developing the business so that it would be a financial success. In addition, compensation by way of salary was to be modest with the hoped-for reward to be in the ownership and operation of a successful business. We think persuasive the argument of plaintiff, that, "This being so, it is entirely natural for two men starting out on a serious venture involving a great amount of capital investment and untold years of hard work to want to make some provisions for the control of the venture after the death of one of them." While considering an option agreement, in Black and White Cabs of St. Louis, Inc. v. Smith, 370 S.W.2d 669, 675, Mo.App., the court said: "The purpose to be served by the parties executing the contract was to assure all shareholders that if any one of them desired to sell his stock, it would not be sold to strangers and that the corporation and the shareholders would continue in the management and care of the affairs of the corporation without having to adjust themselves or accommodate themselves to a new relationship with a shareholder who would be a stranger to their group." It would be unreasonable to assume the two men originally dedicated their entire effort to this business without a mutual trust and confidence in the other, and there is nothing to suggest the survivor intended to bind himself to work daily and for an untold number of years with others with whom he might not have the same trust and confidence. If such truths were to be ignored, we would be giving only lip service to our stated purpose of attempting to resolve the true intent of the contracting parties and the accepted standards and guidelines by which such intent is to be determined.

At the trial, Powell, as the survivor, could not testify as provided by the Dead Man's Statute. Section 491.010. However, the effort of Kennedy to make the quoted paragraph totally ineffective, wheth-

er it be called a first option or an absolute option, was developed. Slightly over three months before his death, Kennedy created the trust previously mentioned. It provided (Article II(1)): "The Trustee shall hold, manage and vote the capital stock of the Columbia Brick and Tile Company herein placed in trust * * * *exercising all the right and privileges incident to the same as if said stock were held and owned by him absolutely,* provided, however, said capital stock of Columbia Brick and Tile Company * * * *shall be sold as a unit* * * *.*" (Emphasis added.) In view of our finding as to what was the true intent of the parties, we need not discuss all possible inferences that logically could be drawn from such action.

After considering all factors, we are compelled to conclude that both Powell and Kennedy appreciated the desire of the other to continue in control of the business upon the death of either; and that, notwithstanding the terminology used, it was actually the intent of both that the survivor would have an absolute option to buy sufficient shares as might be required for him to legally continue to exercise control of the business.

The further question remains—is the agreement susceptible to being specifically enforced? In seeking the answer, we will first consider each of defendants' arguments that it is not.

■ First, it is argued that plaintiff has an adequate remedy at law if the "fair value" of six percent of the shares can be determined. However, the law is to the contrary as it has been established that: "No question can exist as to the right to sue in equity for the specific performance to deliver shares of stock whenever it is shown that the shares contracted for have no market value, or are difficult to obtain elsewhere, or there is some reasonable cause for the delivery of the particular shares arising out of the relation they bear to the control of the corporation. In all such cases the action for damages at law is wholly inadequate, and complete relief can

only be had in equity." Whiting v. Enterprise Land & Sheep Co., 265 Mo. 374, 177 S.W. 589, 591.

Second, argument is made that "the agreement which the plaintiff * * * seeks to enforce is void and unenforceable because it violates the rule against restraints on alienation of property." This contention presents a rather ambivalent approach to the problem. After contending that Kennedy and Powell did, in fact, intend for the survivor to have a pre-emptive right, wherein the decision to sell would have to be made by the heirs or successors of Kennedy, in this point it is argued such a restraint on freedom of alienation by such persons would make the pre-emptive right void. It is sufficient to say that in view of our finding an absolute option was granted, we need not discuss other possibilities pertaining only to a first option or pre-emptive right.

Third, it is submitted that the contract is not subject to being specifically enforced for the reason it submits the "essential element of price to arbitrators or appraisers"; and fourth, that the agreement is "too indefinite and uncertain as to the essential element of price." The two points are related and will be considered together. However, we should point out that we do not believe the agreement calls for the use of arbitrators as that term is generally used reference settlement of disputes. In any event, the parties did agree that others, "competent outside certified accountants," were to determine the "fair value."

We have considered every case cited by defendants on points Third and Fourth, and find none to be comparable factually. For instance: in Jenks v. Jenks, Mo.App., 385 S.W.2d 370, the court refused to force arbitration as to which "eastern school" the daughter of divorced parents would attend; in Terry v. Michalak, 319 Mo. 290, 3 S.W.2d 701, a contract for sale of property was not enforced because it failed to provide the number, amounts or maturity dates of notes to cover

the deferred payments; in Poole v. Campbell, Mo., 289 S.W.2d 25, plaintiff failed to establish an oral contract to convey; and, in P.R.T. Inv. Corp. v. Ranft, 363 Mo. 522, 252 S.W.2d 315, relief was denied on a contract which was also "Subject to purchaser accepting the seller's lease on ground." However, as defendants argue: "Ordinarily agreements relating to arbitration or valuation will not be specifically enforced," 81 C.J.S. Specific Performance § 72, page 580, and courts have been reluctant to assume the task. Nevertheless, in recognition of the fact that an arbitrary application of such a general principle would in many instances result in grave injustice, the courts have allowed for a more equitable result in certain cases by following what is accepted as a modified rule. A full review of the rule and the development of exceptions thereto may be found in 167 A.L.R. 727 under the title "Specific performance of contract or option as affected by unexecuted provision for determination of price by arbitrators or appraisers," and as said, loc. cit. 743(3): "One of the underlying reasons for the establishment of the modified view allowing specific performance of contracts providing for price determination by arbitration or appraisal is that where there has been a part performance of the contract, and the parties therefore may not easily be placed in status quo, it would be inequitable to permit the contract to lapse because of the failure of the arbitration or appraisal proceedings." It can not be argued that this court has not recognized the exception as shown by the case of Tureman v. Altman, 361 Mo. 1220, 239 S.W.2d 304. In an exhaustive opinion by Judge Barrett, the general rule as well as the need and justification for the exception were fully reviewed and considered. Briefly, contracting parties had agreed that after the first fifteen years the rental for a ninety-nine year lease would be adjusted on the basis of a new appraisal every five years. After repeated disputes and inability to agree on a new appraisal, the trial court determined the proper figure and this court approved. After finding that factually it

could not be said that the agreement for ascertainment of price [rental] was incidental to the main purpose of the contract (a recognized reason for the exception), the court went on to say, loc. cit. 309: "It does not necessarily follow, however, that there are not other good and sufficient reasons for the court's intervention and even temporary settlement of this controversy. This contract has been in existence for fifty-five years and no one questions its validity. There has been part performance of the contract by all the parties. Annotation 47 L.R.A.,N.S., 337, 369. The original parties to the contract did not contemplate an abortive appraisal or a miscarriage of the appraisal provisions of the lease and, in effect, contracted for a fair valuation and a fair rental. Pomeroy, Specific Performance, Sec. 151, p. 386. 'It is to be presumed that the parties contracted with reference to fair, reasonable, and practical results, and the language employed by them should have a fair, reasonable, and practical construction. While equity does not make contracts for parties, it gives construction (force) to contracts which parties make for themselves, * * *.' Arnot v. Alexander, 44 Mo. [25] loc. cit. 29, 100 Am.Dec. 252. There has been part performance of the admittedly valid contract and both the lessors and the lessees have acquired rights that they are entitled to have enforced. Bird v. Couchois, 214 Mich. 607, 183 N.W. 36. In a renewal case it would be inequitable for the lessor to appropriate improvements or refuse to renew the lease merely because arbitration had failed. On the other hand, it would be inequitable to permit the lessee to enjoy the benefit of the premises when the rental value had greatly increased and the parties had contemplated an increased rent with increased rental value. There has been part performance throughout the years, rights have been acquired on both sides, and some preliminary modification of the contract is now necessary to fairly carry out its terms; the rental value cannot be determined as provided in the lease and it is appropriate that a court of equity enforce it as fairly as

possible. Kaufmann v. Liggett, 209 Pa. 87, 58 A. 129, 67 L.R.A. 353, 103 Am.St.Rep. 988; 1 Cor.L.Q. 225; 50 Har.L.R. 533." See Biddle v. McDonough, 15 Mo.App. 532 and Black v. Rogers, 75 Mo. 441 for earlier reviews of the same question. The factual similarity of the instant case is obvious. For some fifteen years both Kennedy and Powell had complied with their contractual agreement; and as each year of work and dedication to the business went by, rights given by the option increased in importance. The reluctance of a court of equity to participate in the performance of executory contracts, calling for such things as appraisals and determination of price considerations, should not prevail when a contract has been fully performed and executed for such a long period of time, and failure to carry out the original intent of the parties would result in an unnecessary injustice. Precedents, as discussed, call for us giving force and effect to the option agreement.

■ Lastly, defendants contend that "control" is too intangible and carries with it such rights and implications as to be beyond valuating. We need not express our opinion on this conclusion in view of what we consider to have been the meaning of the parties. Management control had been exercised by both men, and it does not appear to have been within the contemplation of either that a "bonus" was to be paid for the privilege of continuing on the death of the other. As written, the option indicates the parties did not contract for the sale of control but for the sale of a specific number of shares of stock in the corporation, knowing that the "control factor" would pass with those shares. Clearly, the option does not provide the survivor shall have an option to purchase control at a fair value, which would have been the normal way of expressing such intent if control, as such, had been the item for sale. Control appears to have been mentioned simply to modify the amount of stock subject to the option. There is no expression indi-

cating that 6% of the shares were to be valued on a different basis than the other 94%. This leaves only one alleged obstacle to specific performance of the agreement, i. e., is "fair value" of the stock beyond resolving? This term certainly creates no more difficulty than the submission of other questions for appraisals, which has been done under the demands of the modified rule heretofore discussed, and the same rationale should apply. As used in reference to the value of a share of corporate stock, the term "fair value" has inherent within it the legitimate assumption that it will be determined by following recognized accounting principles. Failure of accountants to do so certainly would not be beyond the comprehension of a court of equity.

After finding that this contract is susceptible to a decree of specific performance, we, of necessity, find the judgment of the trial court to be erroneous. The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

All concur.